# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 16, 2008

Charles R. Fulbruge III
Clerk

———

No. 06-70008

———

DAVID LEE POWELL

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

———

Appeal from the United States United States District Court
for the Western District of Texas, Austin

———

Before JOLLY, DAVIS, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Following his third punishment trial in 1999, David Lee Powell was convicted and sentenced to death for the 1978 capital murder of Austin Police Officer Ralph Ablanedo. We granted a certificate of appealability (COA) authorizing Powell to appeal the district court's denial of federal habeas relief. Powell v. Quarterman, 2001 WL 1747001 (5th Cir. Apr. 16, 2008) (unpublished). We now AFFIRM the judgment of the district court.

I.

We set out the facts and procedural history in our unpublished order granting a COA. We repeat them here for purposes of convenience. Powell was valedictorian and "most likely to succeed" in his high school class. After

graduating from high school a year early, he was accepted into the Plan II Honors Program at the University of Texas. While there, he became an anti-war protester and began using drugs. He never finished college. By 1978, when he was 28 years old, he had become a heavy user of methamphetamine and was also selling it. He was wanted by the police for misdemeanor theft and for passing over 100 bad checks to merchants in the Austin area. He had become so paranoid that he had begun carrying around loaded weapons, including a .45 caliber pistol, an AK-47, and a hand grenade.

On May 17, 1978, Powell asked his former girlfriend, Sheila Meinert, to drive him from Austin to Killeen, Texas. They went in Powell's car, a red Mustang. Powell had the .45, the AK-47, and the hand grenade with him, as well as a backpack containing about 2 1/4 ounces of methamphetamine.

Officer Ablanedo was on duty in his marked patrol car when he spotted the Mustang and noticed that it did not have a rear license tag. He pulled the vehicle over. Meinert got out of the car and approached Ablanedo. She told him that she had lost her driver's license, but showed him her passport. Ablanedo also checked Powell's driver's license and asked the dispatcher to run a warrant check on Meinert and Powell. The dispatcher informed Ablanedo that the computers were not functioning properly, but that there were no local warrants for Meinert. Ablanedo gave Meinert a ticket for failing to display a driver's license and allowed her and Powell to leave. Moments later, the dispatcher told Ablanedo that Powell had a "possible wanted" for misdemeanor theft. Ablanedo signaled for Meinert to pull over again. Meinert testified that she got out of the car and as she was approaching the officer, she heard a very loud noise and ran back to the car. As Ablanedo approached the Mustang, Powell shot him with the AK-47, in semi-automatic mode, through the car's back window, knocking Ablanedo to the ground. As Ablanedo tried to get up, Powell fired at him again, after switching the AK-47 to automatic mode.

Bobby Bullard, who happened to be driving by on his way home from work, witnessed the shooting of Ablanedo. He testified at trial that he saw shots fired from the Mustang that knocked out the back windshield. He saw a man sitting in the middle of the front seat, lying on top of the console, sort of into the back seat. He said that the man who fired the shots had long hair and was wearing a white t-shirt, and at trial he identified Powell as the man he saw that night. Edward Segura, who lived in the area, heard what he thought sounded like machine gun fire. When he went outside, he saw a red Mustang driving away. Segura testified that Ablanedo said that he had been shot. When Segura asked, "who was it," Ablanedo replied, "a girl."

When the dispatcher learned that there was a possible warrant for Powell, as a matter of routine, she sent Officer Bruce Mills to assist Ablanedo. When Mills arrived at the scene a few minutes later, he found Officer Ablanedo lying on the ground. Although Ablanedo wore a bullet-proof vest, it was not designed to withstand automatic weapon fire. Ablanedo suffered ten gunshot wounds and died on the operating table at the hospital, about an hour after he was shot.

Bullard, his wife Velma, who came outside after seeing the lights from the police car, Segura, and Officer Mills all attempted to aid Ablanedo while waiting for the ambulance to arrive. All of them testified that Ablanedo said, repeatedly, "that damn girl" or "that Goddamn girl."[1] Mills testified that Ablanedo told him that a girl and a guy were in the car, and that they were armed with a shotgun or machine gun. Mills said that Ablanedo told him, twice, that "He got me with the shotgun."

Apparently one of the shots fired by Powell flattened one of the Mustang's rear tires. Meinert drove the car into the parking lot of a nearby apartment

---

[1] Dr. John Blewett, an emergency room physician, and Austin Police Officer Roger Napier, testified that they, too, heard Ablanedo say "that damn girl" when he was in the emergency room prior to his death.

complex. Officer Villegas, who was en route to the scene and who had heard a description of the Mustang in the dispatcher's broadcast, spotted the vehicle in the apartment complex parking lot and pulled in. He immediately came under automatic weapon fire. He testified that a male with medium length hair and no shirt was firing at him. More police officers arrived, and a shoot-out ensued. Miraculously, no one was shot.

Sheila Meinert testified that Powell handed her a hand grenade in the apartment complex parking lot and told her to remove the tape from it. She said that she started peeling tape off the grenade, but was hysterical and shoved it back at him and she did not know what he did with it.

Officer Bruce Boardman testified that the shooting in the apartment complex parking lot came from a person at the passenger side of the Mustang. He said that he saw that person appear again, making "a throwing motion" over the top of the Mustang, and simultaneously, a female at the driver's side of the Mustang ran away from the car, screaming hysterically and flailing her arms. The person at the passenger's side (Powell), after making the "throwing motion," began running away from the scene toward the grounds of a high school across the street.

Later, officers found a live hand grenade about ten feet away from the driver's door of Officer Villegas's car that was parked in the same parking lot. The pin for the grenade was discovered outside the passenger side of the Mustang where the person making the throwing motion had been. The grenade, which had a kill radius of 16 feet and a casualty radius of 49 feet, did not explode because the safety clip had not been removed. The State presented evidence that it was likely that only someone who had been in the Army (Powell had not) would have been familiar with the concept of a safety clip (also known as a jungle clip), which was added to the design during the Vietnam War to keep grenades from exploding accidentally if the pin got caught on a branch.

Meinert was arrested in the apartment complex parking lot. She was later convicted as a party to the attempted capital murder of Officer Villegas. Powell was arrested a few hours later, around 4:00 a.m. on May 18, after he was found hiding behind some shrubbery on the grounds of the high school. Powell's .45 caliber pistol was found on the ground near where he was hiding, and his backpack containing methamphetamine with a street value of approximately $5,000 was found hanging in a tree.

Law enforcement officers searched the Mustang and recovered handcuffs, a book entitled "The Book of Rifles", handwritten notes about weapons, cartridge casings, the AK-47, a shoulder holster, and a gun case. Following a search of Powell's residence, officers seized another hand grenade, methamphetamine, ammunition, chemicals and laboratory equipment for the manufacture of methamphetamine, and military manuals.

In September 1978, Powell was convicted and sentenced to death for the capital murder of Officer Ablanedo. His conviction and sentence were affirmed on direct appeal. Powell v. State, 742 S.W.2d 353 (Tex. Crim. App. 1987). The Supreme Court vacated and remanded for reconsideration in the light of Satterwhite v. Texas, 486 U.S. 249 (1988). Powell v. Texas, 487 U.S. 1230 (1988). On remand, the Texas Court of Criminal Appeals reaffirmed Powell's conviction and sentence. Powell v. State, 767 S.W.2d 799 (Tex. Crim. App. 1989). The Supreme Court vacated Powell's sentence. Powell v. Texas, 492 U.S. 680 (1989).

Powell was convicted and sentenced to death again following his second trial in November 1991. Although the Supreme Court had vacated only the sentence, Texas law at that time required a retrial of the entire case even if the reversal was only for sentencing error. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction, but vacated the sentence and remanded for a new sentencing trial, because the trial court had not instructed the jury to answer the special issue on deliberateness. Powell v. State, 897

S.W.2d 307 (Tex. Crim. App. 1994). By that time, Texas law had changed and no longer required a retrial of the entire case when reversal was only for sentencing error.

Powell filed a petition for a writ of certiorari, claiming that he was entitled to a complete new trial, and not just a new trial on punishment. The trial court stayed the proceedings until the Supreme Court denied certiorari. Powell v. Texas, 516 U.S. 808 (1995).

Powell then filed a motion in the trial court to set aside his conviction and for a complete new trial on guilt or innocence as well as punishment. The trial court denied that motion on May 21, 1996.

Before Powell's third trial began, the defense tried to establish that Meinert was involved in the shooting of Ablanedo and in the exchange of gunfire with officers in the apartment complex parking lot. In pursuit of that theory, they retained a metallurgist to conduct chemical analysis of the bullet fragments recovered from Ablanedo's body after exhumation and a second autopsy in 1998. They also subpoenaed Meinert's parole records.

The testing by the defense expert was incomplete at the time the third trial commenced in February 1999. After they were denied a continuance, defense counsel made a strategic decision not to present any evidence of their "two-shooter" theory. Instead, Powell's counsel told the jury in his opening statement that Powell was responsible for every aspect of the crime, that Meinert had no part in it, and that, therefore, he would not ask the State's witnesses "a single question" about the circumstances of the crime because "there's not going to be a question about how it was done." The defense theory was that Powell was no longer a future danger. In order to preclude the prosecution from introducing victim impact evidence, Powell waived his right to a special issue on mitigating evidence.

Meinert's parole records were delivered to the trial judge on March 1, the sixth day of the State's case and the day before Meinert testified. The trial court, after in camera examination, released the records to defense counsel. Meinert's parole file included the following documents:

(1) A seven-page document on TDCJ letterhead containing an "official version" of the offense.

(2) A document entitled "Statement of Fact Form," executed by Assistant District Attorney Rosemary Lehmberg. It and the "official version" of the offense stated that Officer Ablanedo was shot several times, fell to the ground, and tried to get up, "but as he did, they shot him again, killing him," and that as soon as Officer Villegas approached the red Mustang in the apartment complex parking lot, "they began firing at him and other officers at the scene." (Emphasis added.)

(3) A July 21, 1988 letter written by Austin Police Association president Dell Shaw, accusing Meinert of throwing a hand grenade at Officer Villegas, along with 25 pages of signatures of police officers and others.

(4) A May 27, 1987 letter authored by then Assistant District Attorney Terry Keel, requesting that the Board deny parole to Meinert, with an attached letter authored by Arlene Ablanedo-McNeill, the victim's sister, accusing Meinert of throwing a hand grenade at Officer Villegas, accompanied by ten pages of signatures of police officers and law enforcement personnel.

(5) A September 22, 1988 letter written by Arlene Ablanedo-McNeill, protesting Meinert's parole and stating that Meinert threw a hand grenade at Officer Villegas, accompanied by 17 pages of signatures of police officers and others.

The persons, among the myriad others, who signed the letters to the parole board accusing Meinert of throwing the hand grenade include: (1) Officer Bruce Boardman, who was the only witness who testified at Powell's trial that Powell threw the grenade; (2) Terry Keel, the lead prosecutor at Powell's second trial;

(3) Robert Smith, the lead prosecutor at Powell's third trial; (4) Officers Justin Shaffer and Lupe Trevino, who testified about Powell's arrest; (5) Officer Napier, who testified about Meinert's statement to the police; (6) Bruce Mills, who testified about Ablanedo's dying declaration; and (7) six officers who testified about various aspects of the investigation.

Powell moved for a continuance in order to attempt to interview the persons who signed the letters, but the trial judge denied it. Although counsel was furnished parole records a day before Meinert testified, he made no attempt to use the parole records in cross-examination or in an attempt to establish that Meinert threw the grenade or that she otherwise played a role in the shooting or the grenade episode.[2]

As proof of future dangerousness, the State relied primarily on the facts of the murder and the shoot-out at the apartment complex parking lot, including the throwing of the hand grenade. In addition, the State presented evidence that in 1970, Powell stole a car and used false identification, and that, in early 1978, he followed a maintenance worker home with a knife after the worker prevented him from breaking into a storage building where his landlord had stored his property after he failed to pay his rent. The State also presented evidence of incidents occurring during Powell's incarceration following Ablanedo's murder. In October 1978 he was displeased with the television program being shown in the prison and spat on a corrections officer. In February 1979, he spat at an employee at Rusk State Hospital after the employee told him he would have to get up at 6:00 a.m. to use a razor. In April

---

[2] In a formal bill of exception filed in the trial court in March 1999, Powell stated that the court instructed counsel not to use Meinert's parole records to cross-examine her. The record does not support that statement. In denying the defense request for an adjournment, the trial court stated that the parole file documents were inadmissible hearsay. Just before Meinert testified, defense counsel told the court that the defense was not going to use the documents from Meinert's parole file, because the defense received the material too late to develop the two-shooter theory.

1979, he beat on a door with a chair because he was angry after security would not let him have some food that a visitor had brought to him, and he told a security technician at Rusk State Hospital that he could make $2000 by arranging an escape. In May 1979, he kicked a guard in the courtroom when the guard restrained him while he was trying to hug or kiss his girlfriend. In 1988, he received a disciplinary report for having an extra pair of socks and shorts. In 1989, he received a disciplinary report for playing his radio too loud. In 1990, he received a disciplinary report for not making his bed before 6:00 a.m. Also in 1990, he kicked and banged on a door when he was not allowed to use the telephone to call his attorney. During jury selection for his 1991 trial, he became angry and cursed a guard when he was not allowed to have contact lens wetting solution for his sore eyes. In 1992, he put his foot in front of the door to the day room when a corrections officer was trying to close the door. Finally, in 1996, he received a disciplinary report for refusing to obey an order to remove a poster from the wall of his cell.

Powell's counsel presented evidence that Powell had been a smart, well-mannered, courteous, law-abiding young man with great promise. He grew up on a dairy farm and attended a rural school. He was exceptionally bright. He was valedictorian of his very small high school class, and graduated a year early. He entered the honors program at the University of Texas. But his life soon took a decided turn downhill. He began using drugs, which led to his debilitating addiction, drug dealing, thefts, and increasingly irrational behavior. The defense also presented evidence that once he settled down in prison his attitude took a turn much for the better. Powell became a model prisoner and had developed positive relationships with many Texas citizens. His family and friends testified that, once his involvement with drugs ended after he went to prison, Powell was very much like the young man they had known before he became involved with drugs -- pleasant, sociable, friendly, and helpful to others.

Several prison guards testified for the defense that Powell was quiet, well-mannered, and not a troublemaker in prison. There was evidence that he had helped other inmates learn to read, and that he was involved with other citizens in various forms of volunteer work. He was also admitted to the work-capable program, and had a job in the prison garment factory, where he had access to scissors and other sharp instruments. The assistant plant manager testified that Powell was a good worker in the garment factory.

Thus, nearly all of the evidence of future dangerousness related to the events before Powell went to prison. Furthermore, in closing argument, prosecutor Darla Davis referred to Dr. Wallace's testimony when arguing that Powell was not under the influence of drugs at the time of the murder and shoot-out. In his final closing argument, prosecutor Robert Smith argued, among other points, that Powell's future dangerousness was evident from the fact that he was in full control, and not crazed on drugs, when he shot Ablanedo and threw the hand grenade:

> You want to pretend to me that David Lee Powell knew there was tape on that grenade when he threw it? He's hunkered down in the Mustang in a fire fight for his life. He gave it to Sheila and told her what to do. You see the photograph, it's ten feet from Villegas' patrol car. You think he wasn't trying to kill people?

The jury answered the special issues on deliberateness and future dangerousness affirmatively and the trial court sentenced Powell to death.

Powell filed a motion for new trial in which he argued, among other things, that his due process rights were violated by the untimely disclosure of the exculpatory evidence in Meinert's parole file. In response, the state presented affidavits from Lehmberg, Shaw, and others who signed the protest letters, in which they stated that they had no personal knowledge regarding whether Meinert fired any shots at either scene or threw the hand grenade. The trial court denied Powell's motion for a new trial.

10

The Court of Criminal Appeals affirmed Powell's sentence. Powell v. State, No. 71,399 (Tex. Crim. App. 2002) (unpublished). The Supreme Court denied certiorari. Powell v. Texas, 537 U.S. 1015 (2002).

Powell filed an application for state habeas relief in September 2001. The Texas Court of Criminal Appeals denied relief in September 2002. Ex parte Powell, No. 7,407-02 (Tex. Crim. App. Sept. 25, 2002) (unpublished order).

Powell filed a petition for federal habeas relief on October 30, 2003. The district court adopted the magistrate judge's report and recommendation and denied relief on December 27, 2005. The district court also denied a COA.

## II.

### A.

Based on our limited, threshold inquiry and general assessment of the merits of Powell's claims, we granted a COA authorizing him to appeal the denial of habeas relief for the following three claims:

Claim 1. Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 564 (2002), which were decided while Powell's case was on direct appeal, required that Powell's third trial (a capital resentencing proceeding following affirmance of the conviction) be a complete new trial on all the elements of the capital offense (including guilt-innocence elements) rather than just a retrial on the elements formerly treated as sentencing factors.

Claim 2. The prosecution's failure timely to disclose documents in which agents of the prosecution asserted that Meinert fired shots at Officer Ablanedo and the other officers and threw a hand grenade violated Powell's right to due process under Brady v. Maryland, 387 U.S. 83 (1963).

Claim 3. Powell's Fifth and Fourteenth Amendment rights under Estelle v. Smith, 451 U.S. 454 (1981), were violated when an emergency room doctor,

who did not provide Miranda[3] warnings to Powell when he examined Powell following his arrest, testified for the prosecution about Powell's answers to questions the doctor asked during the examination.

We gave the parties an opportunity to file supplemental briefs on the merits, and heard oral argument. We now turn to consider whether Powell is entitled to federal habeas relief on his claims.

## B.

Powell filed his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, with respect to claims adjudicated on the merits in state court, Powell is not entitled to federal habeas relief unless the state court's adjudication of his claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). An "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The state court's factual determinations "shall be presumed to be correct,"

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.

### A.

Powell's first claim is that Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), which were decided while his case was on direct appeal, required that his third trial (a capital resentencing proceeding following affirmance of his conviction for capital murder) be a complete new trial on all of the elements of the capital offense (including guilt-innocence elements) rather than just a retrial on the punishment elements. Powell's argument is complicated and confusing. As we understand it, he asserts:

(1) deliberateness is an element of the Texas offense of "death-eligible" capital murder;

(2) a special issue on deliberateness was not submitted to the jury at his second trial; and

(3) therefore, his resulting conviction at the second trial was for the lesser-included offense of "non-death-eligible" capital murder.

He therefore contends that Apprendi and Ring dictate that the Texas Court of Criminal Appeals should have vacated both his conviction and his death sentence and remanded for a new trial on all of the elements of "death-eligible" capital murder, including both the guilt-innocence elements and the punishment elements. In his brief, he asserted that to conclude otherwise would violate the Double Jeopardy Clause because it would sanction the trial of a greater offense (death-eligible capital murder) following the conviction and affirmance of its lesser-included offense (non-death-eligible capital murder). In support for that argument, he relied on Brown v. Ohio, 432 U.S. 161, 169 (1977), in which the Supreme Court held that "the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."

13

At oral argument, however, Powell's counsel clarified that Powell is not making a claim that his constitutional rights under the Double Jeopardy Clause have been violated.  Instead, the only remedy he seeks is a complete new trial on both the guilt-innocence and punishment elements.  Powell's argument, reduced to its essence, is simply that bifurcated capital murder trials are not permitted unless the same jury that finds the defendant guilty also decides the special issues related to punishment.  Apprendi and Ring do not require such a rule.

At issue in Apprendi was a New Jersey hate crime statute that provided for an increase in the maximum prison sentence for a crime based on the trial judge's finding, by a preponderance of the evidence, that the defendant, in committing the crime, had acted with a purpose to intimidate the victim based on particular characteristics of the victim.  530 U.S. at 468-69.  The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 490.

In Ring, the Court considered an Arizona statute which provided that, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty."  536 U.S. at 588.  The Court held that the Sixth Amendment guarantees that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  Id. at 589.  The Court concluded that "[b]ecause Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury."  Id. at 609 (internal quotation marks and citation omitted).

The Texas court's decision to remand for a new trial only as to punishment, and not as to guilt or innocence, was neither contrary to, nor an unreasonable application of Apprendi or Ring, because all of the elements of capital murder necessary for the imposition of the death penalty were submitted to a jury and proven beyond a reasonable doubt. As Powell concedes, neither Apprendi nor any other Supreme Court decision requires the same jury to determine guilt and punishment.

Powell can cite no authority to support his argument that, in affirming his conviction for capital murder but vacating the death sentence and remanding for a new punishment trial, the Texas Court of Criminal Appeals effectively converted the underlying conviction for capital murder into a lesser-included offense. There is no support for such an argument because the reversal of the death sentence was not on any basis that bars retrial of the sentencing phase of the prosecution. Certainly there is no clearly established law decided by the Supreme Court to that effect. The state court's decision ordering a new trial only as to punishment issues is therefore neither contrary to, nor an unreasonable application of, clearly established federal law. We now turn to consider Powell's Brady claim.

B.

(1)

Powell contends that his right to due process under Brady v. Maryland was violated by the prosecution's failure timely to disclose the Meinert parole documents in which agents of the prosecution asserted that Meinert fired shots at Officer Ablanedo and the other officers and threw a hand grenade. He contends that the measure of his culpability, and the calculus of his future danger, would have changed significantly in his favor if the jury believed that Meinert was involved in the shooting to the extent described in Assistant District Attorney Lehmberg's "Statement of Fact Form" or that Meinert threw

the hand grenade at Officer Villegas. He contends further that, even if the jury did not believe that Meinert was involved in the shooting or the throwing of the grenade, he could have used the documents to discredit the prosecution, by arguing that if the police and prosecutors would lie to keep Meinert from getting parole, they would also lie to keep the jury from answering "no" to the future dangerousness special issue.

Under Brady, the prosecution has a duty to disclose to the defense exculpatory evidence that is material either to guilt or to punishment. Brady, 373 U.S. at 87. The duty to disclose extends to evidence that may be used for impeachment. United States v. Bagley, 473 U.S. 667, 676 (1985). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995); see also Strickler v. Greene, 527 U.S. 263, 280-81 (1999). Accordingly, to establish a Brady violation, a defendant must make the following showing: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler, 527 U.S. at 281-82. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. A determination of the materiality of withheld evidence must be made "collectively, not item-by-item." Kyles, 514 U.S. at 437 . "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434.

The Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been "suppressed" within the meaning of Brady. Our court has held that such evidence is not considered to have been suppressed. See United States v. Williams, 132 F.3d 1055, 1060 (5th Cir. 1998); see also Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994); United States v. McKinney, 758 F.2d 1036, 1049-50 (5th Cir. 1985). In this Circuit, when the claim is untimely disclosure of Brady material, we have looked "to whether [the defendant] was prejudiced by the tardy disclosure." Williams, 132 F.3d at 1060. We have held that a defendant is not prejudiced if the evidence is received in time for its effective use at trial. United States v. Walters, 351 F.3d 159, 169 (5th Cir. 2003) (collecting cases).[4] These principles that we have applied to claims of untimely disclosure of Brady material -- and which the Texas Court of Criminal Appeals applied in Powell's case -- are consistent with the purpose of the Brady disclosure requirement, which is to ensure that the defendant receives a fair trial. See Kyles, 514 U.S. at 434.

---

[4] Other courts have reached a similar conclusion regarding mid-trial disclosures of Brady material. See United States v. Tyndall, 521 F.3d 877, 882 (8th Cir. 2008) ("A mid-trial disclosure violates Brady only if it comes too late for the defense to make use of it."); United States v. Warren, 454 F.3d 752, 760 (7th Cir. 2006) ("Late disclosure does not itself constitute a Brady violation."); United States v. Knight, 342 F.3d 697, 708-09 (7th Cir. 2003) (Brady not violated where defendant made effective use of tardily-disclosed evidence); McMeans v. Brigano, 228 F.3d 674, 684 (6th Cir. 2000) ("Generally, exculpatory evidence must be produced by the prosecution "in time for effective use at trial."); United States v. Woodley, 9 F.3d 774, 777 (9th Cir. 1993) (disclosure of Brady material "must be made when it is still of substantial value to the accused"; defendant not prejudiced by untimely disclosure where evidence was used effectively at trial); United States v. Patrick, 965 F.2d 1390, 1400 (6th Cir. 1993) ("Delay [in disclosure] only violates Brady when the delay itself causes prejudice."); United States v. Warhop, 732 F.2d 775, 777 (10th Cir. 1984) (due process satisfied if Brady material is disclosed before it is too late for the defendant to make use of the benefits of it); United States v. Higgs, 713 F.3d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if Brady material is disclosed to appellees in time for its effective use at trial."); United States v. Kubiak, 704 F.2d 1545, 1550 (11th Cir. 1983) (Brady not violated by untimely disclosure of evidence which was utilized at trial, because the focus of due process violation is "not upon the fact of nondisclosure, but upon the impact of nondisclosure on the jury's verdict").

With these legal principles in mind, we turn our attention to the state court's decision. On direct appeal, the Texas Court of Criminal Appeals rejected Powell's Brady claim for two reasons: (1) the alleged Brady evidence was not material; and (2) the evidence was disclosed to Powell in time for him to have made effective use of it.

(2)

The Texas court held that, even assuming that the documents were admissible, the "official version" and "Statement of Fact Form," which implied that Meinert participated in the shooting, were not material because those documents were prepared by persons who had no firsthand knowledge of the events. The court noted that Assistant District Attorney Rosemary Lehmberg, who signed the Statement of Fact Form, submitted an affidavit at the hearing on Powell's motion for a new trial in which she stated that she was familiar with the facts of Meinert's and Powell's cases; that "[t]here is no evidence of which I am aware that shows that Sheila Meinert fired a weapon"; that she was not present when the shootings took place and had "no personal knowledge of what occurred"; and that the "use of the term 'they' in reference to 'they shot him again' and 'they began firing at him' is imprecise." The Court of Criminal Appeals concluded that there was not a reasonable probability that the outcome of the proceeding would have been different, had this evidence been disclosed to the defense.

With respect to the petitions stating that Meinert threw the hand grenade, the court stated that they would have had little, if any weight, against Officer Boardman's testimony that he saw the male individual on the passenger side of the Mustang make a "throwing motion." The court observed that, with the exception of Boardman, none of the persons who signed the petitions had any personal knowledge of the events or were present at the scene. The court thus concluded that the statements and signatures of prosecutors, police officers, and

other law enforcement personnel in the context of a parole hearing, about the facts of the offense, when they had not been personally present at the scene, would not carry much probative value.

The court stated that although Powell could have impeached Officer Boardman's testimony with Boardman's signature on the petition attached to the letter stating that Meinert threw the grenade, there was not a reasonable probability that Powell would have been given a life sentence if the letter had been more timely disclosed. The court noted that Boardman's trial testimony was only that he saw the male figure make a throwing motion. The court pointed out that Powell did not dispute that the grenade's safety pin was found right outside the passenger door of the Mustang, where Powell, not Meinert, had been seated and had been firing at the police. The court stated that, in the light of the trial testimony, the physical evidence, and the testimony that Powell routinely carried an assault rifle and hand grenades around with him, it could not conclude that the impeachment value of the parole protest letters was sufficiently strong to demonstrate a reasonable probability that Powell would have been given a life sentence rather than death.

The court also held that the evidence was disclosed early enough to have been of use to Powell. The court noted that the evidence was disclosed to Powell during the State's case in chief, before Meinert testified, and that, assuming it was admissible, Powell could have presented the evidence during the defense case, and could have recalled Officer Boardman for impeachment purposes. The court rejected Powell's claim that he could not have effectively used the evidence because he had previously stated in his opening statement that Meinert was blameless. The court reasoned that defense counsel's opening statement did not bar him from presenting contrary evidence later, but simply would have required him to make a choice about his strategy and how he would explain it to the jury.

(3)

Powell contends that all of the evidence in Meinert's parole file was admissible as admissions of a party opponent. He contends further that the evidence was material, because it called into question the primary evidence that the State relied on as proof of his future dangerousness -- that Powell was the only shooter and that he threw the hand grenade. He contends that there is a reasonable probability that the outcome would have been different if he had been able to show that he was not solely responsible for the events on the night of the murder, and that the prosecution had dealt leniently with Meinert (she was convicted of attempted capital murder of Officer Villegas in connection with the shoot-out, was sentenced to 15 years, and served four years before being paroled). Powell asserts that Lehmberg's attempt to minimize the accuracy of the "Statement of Fact Form" based on lack of personal knowledge would not have been credible to the jury, because the jury would have seen the prosecution as taking contradictory positions -- casting the document as inaccurate at Powell's trial when it was in their interest to place all the blame on Powell, but having presented it as an accurate version before the Parole Board, when their interest was keeping Meinert in prison. Powell argues that the suppressed evidence would have raised questions about the credibility of the entire prosecution team and its theory of the case, because Smith, the lead prosecutor, maintained at trial that Powell threw the grenade, even though he was among the signatories to a letter to the parole board stating that Meinert threw it. Smith also maintained that Meinert was not involved in the shooting at either scene, even though the Statement of Fact Form signed by an attorney in his office stated that both Powell and Meinert fired shots. Powell argues that, had he been able to present evidence that agents of the State had taken the position that Meinert participated in the shooting and threw the hand grenade, the jury might have viewed his role as the impulsive behavior of a drug-impaired, strung-out, desperate person rather than a cold, calculating, unrepentant person who

was willing to risk the lives of not only the police officers in the apartment complex parking lot, but also those who were sleeping in the nearby apartments.

Powell maintains that there was considerable circumstantial evidence that Meinert participated in the shooting at both scenes and that she threw the hand grenade:  Before he died, Officer Ablanedo told Edward Segura that a girl shot him, and other witnesses also heard Officer Ablanedo say, over and over, "that damned girl."  Meinert testified that Powell gave her the grenade and told her to remove the tape from it, and she gave conflicting testimony as to whether she took the tape off, although she did say that she threw it back to Powell.  When the grenade was found by the police, there was still some tape wrapped around the spoon, and the backup safety clip had not been removed.  Powell argues that he was familiar with hand grenades and would have known that the grenade could not have exploded in that condition, and this supports an inference that Meinert, who knew nothing about grenades, must have been the one who threw it.  Powell asserts that Meinert had the same motive to fire at the officers in the apartment complex parking lot and to throw the grenade, because she was just as likely as Powell to be shot by the police or arrested.

Powell contends further that the state court unreasonably decided that the materials were disclosed in time for him to have used them effectively.  He asserts that once defense counsel had admitted in his opening statement that Powell committed the entire crime by himself, there was no credible way that defense counsel could have taken back that statement admitting Powell's guilt and exonerating Meinert.  Powell argues that he was prejudiced by the late disclosure because it caused the defense to admit guilt, exonerate Meinert, and put all of their effort into showing that Powell was no longer a danger to anyone. He notes that, after eleven hours of deliberation, the jury was deadlocked 9-3 on the issue of future dangerousness.

For all of these reasons, Powell argues that he was prejudiced by the late disclosure of the Meinert parole documents.

(4)

The State argues that the documents in Meinert's parole file are not material to the punishment verdict because they are inadmissible hearsay. Even if they had been admitted, the State maintains that the prosecution would have called the persons who signed the documents, and they would have testified that they had no personal knowledge of whether Meinert participated in the shooting or whether she threw the hand grenade. The State points out that the only witness to the murder, Bobby Bullard, testified that he saw Powell shoot Officer Ablanedo from inside the car, and that no one testified that Meinert fired a weapon during the shootout in the apartment complex parking lot.

The State contends that any attempt to impeach Officer Boardman (the only witness who testified that he saw the male on the passenger side of the Mustang make a throwing motion) with the protest letter that he signed would have had little impact on the jury, because other evidence led to the conclusion that Powell was the only shooter and threw the grenade: Bobby Bullard identified Powell as the person who shot Officer Ablanedo; Velma Bullard identified Powell as the person in the passenger seat of the Mustang; Officer Villegas identified Powell as the person shooting at him during the shoot-out; Officer Hearon testified that the male was on the passenger side of the Mustang shooting at the officers with an assault rifle; Officer Foree testified that Meinert ran from the driver's side when she surrendered; Officer Williams found the grenade pin on the passenger side of the car; and Meinert testified that Powell handed her the grenade and told her to remove the tape, but she was appalled and gave it back to him.

The State further contends that, even if the parole file documents had persuaded the jury that Meinert threw the grenade and fired shots during the

shoot-out, there is no reasonable probability that this would have affected the jury's verdict on future dangerousness because, as the district court noted: Powell does not dispute that he killed Ablanedo by shooting him numerous times with an automatic AK-47 and that he attempted to shoot numerous other police officers with the same weapon; he did not challenge the evidence that piror to the murder he routinely carried the AK-47 and a hand grenade with him wherever he went; and he did not challenge the evidence that police discovered in his residence other weapons, including another hand grenade, books on weaponry and guerilla warfare, the components of a methamphetamine lab, and methamphetamine. The State contends that, although Powell presented evidence that he had been a model prisoner for 20 years, the jury was well aware of the fact that he had been locked up in prison under strict guard, without access to weapons and drugs.

The State contends further that, in any event, the evidence in Meinert's parole file was disclosed to Powell in a timely manner. Because the fact that the State actively opposed Meinert's parole was addressed by Powell's counsel during the second trial, the State maintains that Powell either knew or should have known of the essential facts that clearly would have permitted him to argue that Meinert was an active participant in the crime.[5] The State contends further that the Texas Court of Criminal Appeals reasonably concluded that the disclosure of the documents at trial allowed Powell to make use of them without losing credibility. The State maintains that Powell could have capitalized on the

---

[5] At the 1999 trial, prosecutor Robert Smith stated that the contents of the parole file were disclosed to the defense more than a year before trial. Powell's counsel who represented him at the 1999 trial submitted affidavits in which they stated that they themselves saw the contents of Meinert's parole file for the first time during the 1999 trial. At the 1991 trial, during defense counsel's cross-examination of Meinert, counsel asked her if she knew that the judge had written a letter recommending parole. Defense counsel also referred in closing argument to the judge's letters to the Parole Board on behalf of Meinert. This indicates that in 1991 the defense was aware of at least some of the contents of Meinert's parole file, which included two letters from the judge in support of her parole.

timing of the disclosure and explained his change of strategy by blaming the State.  The State also notes that the record reflects that Powell's counsel were prepared to change course in mid-trial if their expert ballistics report had come back and indicated that Meinert may have shot at Ablanedo.

(5)

Under AEDPA, it is not our task to decide de novo whether Powell's rights under Brady were violated.  Instead, our review is limited to determining whether the state court's decision that the documents in Meinert's parole file were not material and were disclosed in time to be of effective use to Powell is contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court.  Dickson v. Quarterman, 462 F.3d 470, 477-78 (5th Cir. 2006).  We conclude that it is neither.

Assuming that all of the documents in Meinert's parole file were admissible and had been used by the defense at trial, the State could have called the witnesses who signed the documents and they would have testified that they had no personal knowledge of whether Meinert fired any shots or threw the grenade.  The only witness to the shooting of Officer Ablanedo testified that Powell fired all of the several shots.  There was no evidence that Meinert fired a weapon at the scene of the murder or at the apartment complex parking lot. Even if we assume that the defense could have impeached Officer Boardman, the only witness who testified that he saw Powell make a throwing motion, and further assume that, as a result, the jury believed that Meinert threw the grenade, other probative evidence of Powell's future dangerousness prevents our concluding that the state court unreasonably applied Brady when it determined that the evidence was immaterial.  In the light of the evidence that Powell murdered Officer Ablanedo with a fully automatic AK-47, and then used that same weapon to fire at the other police officers in the apartment complex parking lot; that Powell purchased the hand grenade thrown in the parking lot,

as well as the one found in his apartment; that Powell carried guns and a hand grenade around with him in his car wherever he went; and that Powell handed the grenade to Meinert and told her to remove the tape from it, the state court could reasonably conclude that this evidence rendered the impeachment evidence immaterial because confidence in the outcome was not undermined. Furthermore, the circumstantial evidence that Powell threw the grenade was strong: the safety pin was found outside the passenger door of the Mustang, where Powell was seated.

Powell's trial strategy was to persuade the jury that he had become non-violent in the years since the murder and shoot-out and thus there was not a reasonable probability that he would be violent in the future. Because he chose not to contest that his activities prior to his arrest were violent, it is unlikely that it would have made any consequential difference to the jury whether he threw the hand grenade himself, or handed it to Meinert to throw. Although the prosecutors referred in closing arguments to Powell having thrown the hand grenade, that was not the primary factor that the State relied on to convince the jury that Powell would be dangerous in the future.

Furthermore, the state court's decision that the evidence was disclosed in time for Powell to have used it effectively at trial is not unreasonable. Although Powell's counsel may have had to explain why defense counsel's opening statement exonerating Meinert and placing all of the blame on Powell was being abandoned, they could have done so by blaming the State for the tardy disclosure of Meinert's file. The record reflects that Powell's counsel anticipated that they might need to change the defense theory, notwithstanding counsel's opening statement exonerating Meinert. In a bench conference about the defense expert's tests on bullet fragments removed from Officer Ablanedo's body during the second autopsy, Powell's counsel stated: "We made the election on our opening statement, but as a matter of law the court knows that we're not bound

25

by our opening statement. If this comes back a hit, we have the right to present whatever evidence that we have." Thus, counsel apparently were prepared to abandon the opening statement and change theories mid-trial if their expert's tests had produced any evidence to support their "two-shooter" theory. Powell's counsel received Meinert's parole file on March 1, 1999, the day before Meinert testified for the State. The following day, after the trial court denied Powell's motion for a three-day adjournment to investigate, and his motion for a mistrial because of the untimely disclosure, Powell's counsel stated on the record that they had received information from their ballistics expert and that the record could note that he, Powell's counsel, was "smiling today," thus indicating, that even after the Meinert parole file had been disclosed to defense counsel, counsel still had not abandoned presenting a "two-shooter" defense. Under these circumstances, we cannot conclude that the state court unreasonably decided that Powell was not prejudiced by the late disclosure of the materials in Meinert's parole file.

Because the state court's decision is neither contrary to, nor an unreasonable application of, any clearly established federal law, as determined by the Supreme Court, the district court did not err by denying habeas relief on Powell's Brady claim. We will now turn to Powell's final claim.

C.

Powell's final claim is that his Fifth Amendment rights were violated when an emergency room doctor, who did not provide Miranda warnings to Powell when he examined Powell following his arrest, testified for the prosecution about Powell's answers to questions the doctor asked during the examination.

About twelve hours after he was arrested, police officers took Powell to a hospital emergency room to be examined. Dr. Wesley Wallace conducted the examination. Two police officers were present during the examination. Dr.

Wallace was called as a witness for the prosecution. Powell's counsel objected as follows:

> This witness testified at the last trial, and there's a Jackson v. Denno [, 378 U.S. 368 (1964)] issue if they're going to question him about any statements that Mr. Powell made or any opinions that he reached based on statements that Mr. Powell made. He's a psychiatrist who examined Mr. Powell.

The prosecutor and Powell's other lawyer immediately pointed out that Dr. Wallace is not a psychiatrist. The prosecutor tendered to the trial court a transcript of Dr. Wallace's testimony from Powell's first trial, where Powell's counsel called Dr. Wallace as a defense witness and was questioned about the statements Powell had made during the examination. The prosecutor argued that any objection had, therefore, been waived. Powell's counsel responded that Dr. Wallace had testified as a defense witness at the guilt phase of the first trial, where future dangerousness was not at issue, and that this did not constitute a waiver of any of Powell's rights at the punishment phase. Counsel stated that, "by opening the door at guilt, you don't open it at punishment under Estelle v. Smith." The trial court overruled the objection and denied the requested hearing.

Dr. Wallace testified that he obtained a medical history by talking with Powell and that he conducted a physical and mental examination. According to Dr. Wallace, Powell did not appear to be under the influence of drugs. He testified that he asked Powell if he had recently used drugs, and Powell indicated that he had not. He testified further that Powell appeared to understand questions and responded appropriately to them, and that he was oriented to place and person, although he seemed unusually nervous.

During deliberations, the jury sent a note to the judge stating: "We want to know if the physician asked him if he had been using drugs and what Mr.

Powell's response was."  The judge had the court reporter read the requested testimony to the jury.

Powell argues that the questioning and observation of him by Dr. Wallace, without warning him of his Miranda rights, violated his Fifth and Fourteenth Amendment rights.  He relies for support on Estelle v. Smith, 451 U.S. 454 (1981).  In Estelle, a psychiatrist who had conducted a court-ordered pretrial psychiatric competency examination of the defendant, without providing the warnings required by Miranda, testified at the sentencing phase of trial that the defendant would be a future danger to society.  The Supreme Court held that this testimony violated the defendant's Fifth Amendment privilege against self-incrimination. Id. at 466.  Powell asserts that he reasonably could have believed that what he said might have been used against him, because he was being questioned about illegal drug usage in the presence of police officers.  He could also have believed that the purpose was to gain incriminating information since there was no reason for him to be taken to the emergency room inasmuch as he was not ill or injured.  He argues that he was prejudiced by Wallace's testimony because it tended to rebut any inference the jury might have drawn that his longstanding drug abuse was a factor in the crime, as opposed to an inherent propensity toward violence.  He also notes that the prosecutors, in closing arguments, referred to Dr. Wallace's testimony in arguing that Powell was in full control, and not under the influence of drugs when he shot Officer Ablanedo and threw the hand grenade.

On direct appeal, Powell argued that the trial court violated his Fifth Amendment right against self-incrimination by overruling his objection to Dr. Wallace's testimony about statements Powell made during the examination.  In rejecting this claim, the Court of Criminal Appeals stated:

> To the extent that an issue was preserved concerning the content of Wallace's testimony, appellant's trial objection seems to have been directed at "psychiatric

> information" testified to by Wallace. But Wallace, an emergency room physician, testified to appellant's physical and mental alertness, not to any psychiatric condition. Thus, appellant's trial objection did not preserve error regarding Wallace's testimony as to appellant's mental alertness.

The district court noted that, although Powell's counsel initially referred to Dr. Wallace as a psychiatrist when objecting, he was immediately corrected by the prosecutor and co-defense counsel. The district court concluded that it is at least arguable that Powell's objection, although not a model of clarity, was adequate to preserve a Fifth Amendment claim. However, the district court further held that Powell was not entitled to relief on the merits. It reasoned that because Dr. Wallace had not been ordered by a court to examine Powell and had not been asked by the police to gain information from Powell, Dr. Wallace had acted solely in his private capacity as an emergency room physician, and he elicited information from Powell that was relevant to the ostensible purpose of his examination. The court concluded that Estelle v. Smith did not apply because the doctor was not ordered by a court to conduct the examination, did not conduct a psychiatric examination of Powell, and did not give any testimony regarding Powell's future dangerousness. The district court therefore concluded that the Texas court's decision was not contrary to, or an unreasonable application of, clearly established law.

As the district court noted, the state court held that Powell failed to preserve a Fifth Amendment claim because his objection was directed at "psychiatric" information. The prosecutor and Powell's other attorney, however, immediately pointed out that Dr. Wallace was not a psychiatrist, and Powell's counsel went on to cite Estelle v. Smith. We agree with the district court that Powell's objection, although not pellucid, was probably adequate to preserve a Fifth Amendment objection. We therefore assume, without deciding, that Powell's claim is not procedurally barred. As a result of its understanding of

Powell's less-than-clear objection, the state court did not adjudicate the claim on the merits. When a claim has been fairly presented to the state court, but the state court does not adjudicate the claim on the merits, and the claim is not procedurally defaulted, the deferential AEDPA standards of review do not apply. See Wright v. Quarterman, 470 F.3d 581, 591 (5th Cir. 2006); Henderson v. Cockrell, 333 F.3d 592, 598 (5th Cir. 2003) . We therefore review the district court's decision on the merits de novo. See Graves v. Dretke, 442 F.3d 334, 339 (5th Cir. 2006); see also Henderson, 333 F.3d at 600-01 (holding that AEDPA's standards of review did not apply to claim that was properly presented to state court but was not adjudicated on the merits by state court); Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998) (reviewing de novo petitioner's ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits).

The district court did not err by concluding that Powell's rights under Estelle v. Smith were not violated. Dr. Wallace was not acting as an agent of the State when he conducted the examination of Powell at the behest of, and in the presence of, the police officers who brought Powell to the emergency room. Dr. Wallace was not court-appointed, he was not a psychiatrist, he did not conduct a psychiatric examination, and he did not express an opinion at trial regarding Powell's psychiatric condition.

Even assuming that Dr. Wallace's testimony violated Powell's Fifth Amendment privilege against self-incrimination because Powell was not advised of his rights prior to Dr. Wallace's examination, any error in admitting Dr. Wallace's testimony was harmless, because it did not have a substantial and injurious influence or effect on the verdict. See Penry v. Johnson, 532 U.S. 782, 795 (2001) (applying harmless error standard in Brecht v. Abrahamson, 507 U.S. 619 (1993), to petitioner's claim that admission into evidence of portion of psychiatric report violated his Fifth Amendment rights under Estelle). To be

30

sure, there was no evidence that Powell was under the influence of drugs when he shot Officer Ablanedo and threw the grenade. Moreover, the record reflects that twelve hours had elapsed between Powell's arrest and Dr. Wallace's examination, and that Powell had been hiding for several hours after he ran from the apartment complex parking lot. Thus Dr. Wallace's testimony that Powell had denied recent drug use, itself, did not necessarily or directly support the prosecutor's argument that Powell was in full control and not under the influence of drugs during the episodes of violence. Furthermore, Dr. Wallace's testimony did not detract from or seriously undermine the defense theory that long-time drug addiction was the factor in the changed character of the defendant from his earlier days and was largely to blame for the crime as opposed to an inherent propensity toward violence. In any event, Dr. Wallace's testimony regarding Powell's statements denying recent drug use had already been indicated by two witnesses. Gary Nelson, the school security guard who found Powell hiding under a bush after the shoot-out, testified, without objection, that Powell was coherent and did not have trouble understanding what was said to him. Also, Justin Shaffer, a police officer who took Powell into custody, testified that Powell was coherent, did not appear to be intoxicated, and seemed to fully understand the Miranda warnings. And of course there is the parenthetical fact that, in another context Powell had been given Miranda warnings. For these reasons, Powell is not entitled to relief on his Estelle claim.

## IV.

The judgment of the district court denying Powell's petition for federal habeas relief is

AFFIRMED.