NOT DESIGNATED FOR PUBLICATION

No. 120,213

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL L. HENDERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed March 27, 2020. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., ATCHESON, J., and WALKER, S.J.

PER CURIAM: Michael L. Henderson appeals from his conviction of electronic solicitation of a child in Douglas County after an undercover police officer responded to a thinly veiled ad for a sexual encounter Henderson posted on the website Craigslist. Before his trial started, the State committed two discovery violations when it inadvertently withheld evidence. Henderson then requested multiple continuances to review and address this new evidence. On appeal, Henderson argues that the delays caused by the State's discovery violations impaired both his statutory and constitutional rights to a speedy trial. He also claims four additional trial errors on appeal: the

1

prosecutor committed error by misstating the law regarding venue during closing arguments, the State did not present sufficient evidence to prove venue, the verdict form violated his right to presumed innocent because it placed "guilty" before "not guilty" on the form, and cumulative error denied him a fair trial. Because our review of the record fails to persuade us that Henderson's claims are meritorious, his conviction is affirmed.

FACTS

In 2015, Henderson and his now ex-wife, Jamie Jenkins, were separated and shared joint custody of their young daughter. Jill Freisberg, Jenkins' aunt, became concerned that Henderson might be sexually abusing his daughter. Freisberg knew Henderson used Craigslist to seek out romantic partners, and found a listing on Craigslist that she believed Henderson had posted. Freisberg found the listing under the "'men seeking women'" section of the website and it was entitled, "'wanna go bowling (Lawrence).'" The entirety of the posting stated:

> "'I don't know why this is so hard, but I'm looking for someone to go bowling with tonight (09/28/16) after midnight when I get off work. My treat. If more happens fine if not fine as well. I am 100% real it's cooling off outside. Respond with "bowling" in the subject line. I'll send pics.'"

Posing as a teenage girl named "Jessica Brown" (Jessica), Freisberg responded to the posting. Henderson and Jessica sent multiple messages over a couple of weeks, but Henderson never solicited sexual activity. Eventually, Freisberg became uncomfortable with the conversation and decided to contact law enforcement. She provided Detective Dean Ohman of the Douglas County Sheriff's Department with the credentials to log into Jessica's account.

After Detective Ohman took control of the account, he contacted Sergeant Chris Evans of the Johnson County Sheriff's Department to consult and assist in the

2

investigation. After reviewing the e-mails between Henderson and Jessica, Evans concluded that the messages warranted a formal investigation.

Soon afterward, Sergeant Evans sent a response to Henderson's Craigslist posting using his own undercover account and posing as a 14-year-old girl named "Heather Johnson" (Heather). During a one-week period, Henderson and Heather exchanged 660 e-mails. Heather revealed her age in the fifteenth e-mail and over the course of the exchange, Henderson initiated conversation about sex, suggested exchanging pictures, and suggested meeting in person.

Henderson and Heather made plans to meet at a location in Lawrence. Upon Henderson's arrival at the designated location, Sergeant Evans and Detective Ohman arrested him. The State subsequently charged Henderson with electronic solicitation of a child.

Before trial, Henderson moved to dismiss the case, claiming that law enforcement engaged in outrageous conduct with the goal of entrapping him after they failed to prove he had molested his daughter. The district court held a hearing on the motion, and Freisberg testified about the Jessica e-mails. Freisberg also testified that she believed the e-mails admitted at the hearing were a fair and accurate copy of the conversation she had with Henderson. Ultimately, the district court denied the motion to dismiss.

Although the district court denied Henderson's motion to dismiss, Freisberg's testimony caused a discovery dispute because Freisberg testified about certain e-mails and a photo that were not given to Henderson in discovery or included in the e-mails admitted into evidence at the hearing. As he was reviewing the e-mails in the case the night before the matter was to proceed to jury trial, Detective Ohman discovered missing e-mails sent between Henderson and Jessica that were not included in the discovery given to the defense. The same night, the prosecutor e-mailed Henderson's counsel, notified

3

him of the discovery, and attached a copy of the missing e-mails. In her e-mail to defense counsel, the prosecutor stated that the e-mails were not "being presented in the State's case in chief" but wanted to make sure he was given a copy as soon as possible "out of an abundance of caution."

The following morning, the attorneys met in chambers to discuss the missing e-mails. The State maintained that the e-mails sent between Henderson and Jessica had been temporarily lost by law enforcement because of a side effect of the software used by the State. According to the State, Detective Ohman used a program that formatted e-mails to create a PDF which was then used as discovery. The State told the district court that this format of the e-mails was difficult to use, so the State requested the Douglas County Sherriff's Department to make "an easier-to-read version" of the e-mails. Once the department completed this version, Ohman realized there were missing e-mails and notified the prosecutor.

Henderson's counsel argued that the e-mails were exculpatory for the impeachment of Freisberg and for Henderson's predisposition to commit the crime. Henderson's counsel asked the district court to issue sanctions against the State for this late discovery and requested the district court to "order the State to show cause as to why the court should not reconsider it's ruling on Mr. Henderson's motion to dismiss for outrageous government conduct." In the alternative, Henderson's counsel requested that the court suppress any evidence of the e-mails between Jessica (Freisberg) and Henderson for all purposes.

The district court determined it was "not going to find that there's bad faith on the part of the State" and it was "not finding that there was a conscious decision to eliminate or redact some [e-mails] and not others." The court agreed with Henderson that the e-mails were exculpatory for the impeachment of Freisberg but declined to reconsider the motion to suppress in chambers. As a result, Henderson's counsel was "compelled to

4

move for a continuance to investigate this matter further" and the district court granted the continuance. Initially, the district court planned to charge the time to the State for speedy trial purposes. But because Henderson's counsel wanted time to file motions and hire an expert witness, he requested the district court charge the State with the time between the day the trial was planned to start, September 18, 2017, and the next available trial date, October 16, 2017, a total of 28 days. Henderson then agreed to waive the remaining time between October 16, 2017, and the rescheduled trial date three months later, February 26, 2018, for a total of 133 days charged to the defense.

Following the continuance, Henderson filed a motion to suppress which requested the district court impose sanctions against the State and suppress all e-mails between Jessica and Henderson. The district court held a hearing on this motion and expressed concern that the State did not realize the e-mails were missing sooner, especially considering Freisberg's testimony at the motions hearing. The district court found that the State's actions violated the discovery statute under K.S.A. 2019 Supp. 22-3212(a) but held there was not "sufficient prejudice" to compromise the ability of Henderson to have a fair trial. The district denied Henderson's motion to suppress. In summarizing the situation, the district court judge held:

> "But I do want to make clear that the State should have from [the first motion hearing] on been comparing and doing what it did the night before trial. That information was there. It was on-line live, and to not go through that and do a comparison until the night before trial instead of the night before the [first motion hearing] is something that I just don't understand. But I think that the continuance makes certain that there's no prejudice to the defense in presenting his defense at trial, and so that's the sanction that is appropriate and that was imposed being the least restrictive sanction to ensure a fair trial."

Following the suppression hearing, Henderson moved the district court to hold the prosecutor in contempt and disqualify her from handling the case. The district court

denied both motions and held that it did not find that the prosecutor "willfully or intentionally withheld information simply because the Court thought that she knew or should have known sometime earlier. When she did know, she took corrective action; she provided it to the defense."

On the day the trial was rescheduled to start, the parties began jury selection. But during a lunch break, Detective Ohman informed the prosecutor that he had failed to include the e-mails from when Freisberg first contacted him. The State informed the district court and Henderson, and Henderson's counsel asked for dismissal in response. The district court denied that sanction. Instead, the district court granted Henderson's alternative motion to continue the trial and charged the time to the State. Ohman testified the next day and stated that he had not included the e-mails in evidence because he had summarized them in his report and they were not "investigative information."

Henderson filed another motion to dismiss before the trial began and argued that the delays resulting from discovery violations had denied him his statutory and constitutional rights to a speedy trial. The district court denied the motion.

Nearly 18 months after his arrest, Henderson's trial began April 9, 2018, the 180th day of the time chargeable to the State. Evans testified at length about his conversation with Henderson while acting as Heather. Evans explained that he let Henderson lead the discussion and only Henderson initiated the sexual topics of conversation. Evans testified that all the e-mails from October 25—including the solicitation e-mail—were sent and received from a coffee shop in Lawrence. Henderson defended the case by arguing that law enforcement had entrapped him. Ultimately, the jury convicted Henderson of electronic solicitation of a child and the district court sentenced him to 55 months imprisonment.

Henderson has timely filed this appeal from his conviction.

6

ANALYSIS

For ease of reference when considering Henderson's issues on appeal, the following is a chart of activities in his case, with rulings and time periods noted:

- October 26, 2016:      Henderson was arrested.
- October 27, 2016:      Henderson was charged.
- March 23, 2017:        Henderson entered a plea of not guilty at arraignment.
- March 23, 2017:        The case was set for trial on July 10, 2017.
- May 25, 2017:          Henderson requested a continuance. Trial was rescheduled for September 18, 2017.
- July 11-12, 2017:      A hearing was held on Henderson's motion to suppress for outrageous government conduct. Freisberg testified to e-mails not included in discovery.
- September 17, 2017:    Detective Ohman discovered first set of missing e-mails.
- September 18, 2017: (fall continuance)    Parties met in chambers to discuss e-mails. The district court denied ruling on a motion to dismiss or suppress but granted a continuance. The district court charged 28 days to the State—September 18, 2017, to October 16, 2017. Henderson waived his speedy trial rights until the new trial date of February 26, 2018; this continuance of 133 days was charged to Henderson.
- February 26, 2018:     Parties completed voir dire but before the jury was sworn in, Detective Ohman informed prosecutors that he was in possession of a second set of missing e-mails. The district court denied Henderson's request to dismiss the case but agreed to continue the trial. The trial was continued until April 9, 2018, and the district court

charged the time to the State—which resulted in exactly 180 days for speedy trial purposes.

- April 9, 2018: Henderson's three-day trial began.

*Statutory speedy trial*

As his first issue on appeal, Henderson argues that the prosecutor's conduct requires the 133 days from October 16, 2017, to February 26, 2018, the time originally charged to him when the trial was first continued, should be retroactively charged against the State. The State argues that Henderson waived his speedy trial right and contends the record does not support Henderson's assertion that the prosecutor was the sole cause of the continuance.

Whether the State violated a criminal defendant's statutory right to a speedy trial raises a question of law subject to de novo review on appeal. *State v. Sievers*, 299 Kan. 305, 307, 323 P.3d 170 (2014).

A defendant who is not in custody is statutorily entitled to be brought to trial within 180 days after arraignment on the charge. K.S.A. 2019 Supp. 22-3402(b). "Only the State is authorized to bring a criminal prosecution to trial, so it is the State's obligation to ensure that a defendant is provided a speedy trial within the statutory limits." *Sievers*, 299 Kan. 305, Syl. ¶ 2. A defendant can waive this statutory right if he or she requests a continuance or files a motion that delays trial beyond the statutory deadline. *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009).

But other rules apply to continuances under the same statute. K.S.A. 2019 Supp. 22-3402(g) clarifies that "[i]f a defendant, or defendant's attorney in consultation with the defendant, requests a delay and such delay is granted, the delay shall be charged to the defendant regardless of the reasons for making the request, *unless there is prosecutorial*

8

*misconduct related to such delay*." (Emphasis added.) Subsection (g) also states that if a delay was initially attributed to a defendant, but subsequently charged to the State, the delay "shall not be used as a ground for dismissing a case or for reversing a conviction unless not considering such delay would result in a violation of the constitutional right to a speedy trial or there is prosecutorial misconduct related to such delay." K.S.A. 2019 Supp. 22-3402(g).

Henderson's argument for reallocating the 133-day continuance charged to him beyond the State's 28 charged days, thus triggering a violation of the 180-day rule, hinges on the "prosecutorial misconduct" language of the statute. See K.S.A. 2019 Supp. 22-3402(g). According to Henderson, the prosecutor's failure to timely disclose the missing e-mails was prosecutorial misconduct and because this misconduct forced him to request a continuance, the time should be retroactively charged to the State.

Unfortunately, the statute at issue does not define prosecutorial misconduct, and the parties disagree over which definition of prosecutorial misconduct should apply to the analysis. Our research has revealed no precedent to guide us in making our decision in this case. A review of all Kansas statutes discloses that K.S.A. 2019 Supp. 22-3402(g), enacted in 2012, is the only statute that uses the language "prosecutorial misconduct." Thus, this is the only situation in which our courts will have to grapple with what definition of prosecutorial misconduct should apply when reviewing it under the statute itself, rather than by applying later caselaw.

Each party's argument rests on whether the Kansas Supreme Court's decision in *State v. Sherman*, 305 Kan. 88, 108-09, 378 P.3d 1060 (2016), applies to the "prosecutorial misconduct" language of K.S.A. 2019 Supp. 22-3402(g). In *Sherman*, the Kansas Supreme Court defined what acts constitute prosecutorial misconduct "through the lens of due process":

9

"Prosecutorial acts properly categorized as 'prosecutorial misconduct' are erroneous acts done with a level of culpability that exceeds mere negligence. A prosecutor who acts with knowledge and intent outside the wide latitude afforded prosecutors, or with a malicious or gross disregard for the fair trial rights of the defendant, is subject to sanction for such misconduct in a separate proceeding outside the confines of the criminal case within which the misconduct occurred." 305 Kan. 88, ¶ 11.

Henderson argues that because subsection (g) was added to the statute in 2012—four years before the *Sherman* decision—the *Sherman* definition should not apply to the panel's analysis of prosecutorial misconduct under K.S.A. 22-3402(g). Henderson notes that "[s]ubsection (g) has not been amended since its enactment in 2012. Subsequent changes to the analysis of alleged trial errors cannot change what the legislature meant with the term 'prosecutorial misconduct' in 2012."

In contrast, the State argues that the *Sherman* definition should apply to the analysis for multiple reasons. First, the State argues that a panel of this court has relied on the *Sherman* definition when analyzing prosecutorial misconduct under K.S.A. 2017 Supp. 22-3402(g). See *State v. Perez*, No. 116,525, at *11-14, 2018 WL 4177536 (Kan. App. 2018) (unpublished opinion). Second, the State contends that it is "more telling" that the Legislature has not changed the statute's prosecutorial misconduct language since the Kansas Supreme Court handed down the *Sherman* decision. The State argues: "Certainly the legislature's inaction on K.S.A. 2019 Supp. 22-3402(g) suggests that they have acquiesced to the definition from *Sherman*." Third, the State argues that there is "no practical reason not to apply [the *Sherman*] definition universally." The State recognizes that although the *Sherman* court was concerned with how the prosecutor explained reasonable doubt to the jury, the "broad language from *Sherman*" defines any purposeful violation of a defendant's rights to constitute misconduct.

While it is tempting to simply adopt the State's rationale that the 2018 *Perez* decision has settled the issue and require that the 2012 amendments to K.S.A. 22-3402(g)

10

be viewed in light of *Sherman*, reality is not that simple. Although it is true that the *Perez* panel did analyze prosecutorial misconduct under K.S.A. 2017 Supp. 22-3402(g) as defined by *Sherman*, the panel explicitly refused to consider the question of which definition to use, because the issue had not been briefed. The panel stated:

> "Significantly, Perez assumes that the *Sherman* court's definition of 'prosecutorial misconduct,' as opposed to 'prosecutorial error' applies in this case. The *Sherman* court adopted the term 'prosecutorial error,' and distinguished that term from 'prosecutorial misconduct,' after the Legislature's 2012 amendment to K.S.A. 22-3402. The 2012 amendment added the 'prosecutorial misconduct' exception to subsection (g). *Thus, there could be debate what the Legislature means when using the term 'prosecutorial misconduct' in subsection (g)*. Regardless, because Perez has not briefed this issue and accepts the *Sherman* court's definition of 'prosecutorial misconduct,' we will address subsection (g) references 'prosecutorial misconduct' as defined by the *Sherman* court. [Citation omitted.]" (Emphasis added.) *Perez*, 2018 WL 4177536, at *11.

As the State points out, *Perez* is the only case that has addressed this issue. In *Perez*, the panel ultimately determined that no misconduct existed under the *Sherman* definition because the error by prosecutors was not intentional. 2018 WL 4177536, at *13-14. The State asserts a similar argument here.

It is important to note that Henderson does not suggest a specific definition of "prosecutorial misconduct" in place of the *Sherman* definition to apply under subsection (g). Rather, he argues that the State acted in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and this violation constituted prosecutorial misconduct at the time K.S.A. 2019 Supp. 22-3402(g) was implemented. See *Wilkins v. State*, 286 Kan. 971, 989, 190 P.3d 957 (2008) ("[a] prosecutor's withholding of exculpatory evidence is misconduct that implicates constitutional rights, regardless of the prosecutor's good or bad faith"). Henderson suggests that a *Brady* violation automatically constitutes misconduct and this conduct qualifies under the language of K.S.A. 2019

11

Supp. 22-3402(g). Consequently, this argument is persuasive only if a *Brady* violation occurred.

Since Henderson has explicitly tied his prosecutorial misconduct claim to an alleged *Brady* violation by the State in this case, it becomes a matter of first importance to determine whether, in fact, such a violation occurred. In other words, if Henderson cannot clearly show that the State committed a *Brady* violation in this case, his entire prosecutorial misconduct argument must fail, and the proposed retroactive reallocating of the 133 days to the State must be denied.

The Kansas Supreme Court has summarized the "analytical steps" of conducting a *Brady* analysis:

"'Under *Brady v. Maryland*, prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

"'Because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.

"'Evidence that is favorable to the accused encompasses both exculpatory and impeachment evidence. For *Brady* purposes, there is no distinction between these two types of evidence that are favorable to the accused; thus, impeachment evidence is considered exculpatory.

"'There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

"'Under the test for materiality governing all categories of *Brady* violations, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

12

outcome.' [Citation omitted.]" *State v. Hirsh*, 310 Kan. 321, 334, 446 P.3d 472 (2019) (quoting *State v. Warrior*, 294 Kan. 484, Syl. ¶¶ 7-11, 277 P.3d 1111 [2012]).

To begin, we are hampered by the fact the record is unclear whether the district court found a full *Brady* violation. At the hearing on January 5, 2018—following the first discovery violation—the district court found that the first two elements of *Brady* were present. The district court determined, "Of the three factors, yes, it's impeaching. Yes, there was evidence that the State didn't provide whether—and it was inadvertent but it was not provided, and so the last is going to be prejudice which we'll talk about in a minute." The district court then reviewed the transcript of the motion to dismiss hearing at which Freisberg testified, and where the court had determined that a discovery violation occurred under K.S.A. 2019 Supp. 22-3212(a). Then the district court addressed the prejudice element of *Brady* and stated:

> "The prejudice is the weakest part in looking at the defendant's motion. There is evidence of exculpatory and/or impeaching evidence and that it was not provided by the State. Case law says to impose the less restrictive sanction that will ensure a fair trial. And I think that was done on the morning of the trial when the State [sic] granted the continuance so that the defense would have access to all of this information. It did—it put the trial off and I know he has a right to a speedy trial. We are still within the speedy trial time and the time was attributable to the State other than what additional time was requested by the defense, and so I don't find that there is sufficient prejudice that compromises the ability of Mr. Henderson to have a fair trial."

Because the district court imposed a sanction, it could follow that the district court found a full *Brady* violation, despite the district court never explicitly finding a full violation. This assumption is what Henderson's argument rests on. But the district court also found that there was not "sufficient prejudice" to compromise Henderson's fair trial rights. We agree. Under the definition of materiality governing *Brady* violations, the e-mails could not have been material because the evidence did not "undermine[] confidence

13

in the outcome of the trial." *Hirsh*, 310 Kan. 321, Syl. ¶ 3. The e-mails were discovered and turned over to Henderson before his trial began, and he was given ample opportunity to review them when the State agreed to his request for a continuance. Additionally, the State did not call Freisberg as a witness at trial, nor did they rely on the e-mails to prove their case.

*Hirsh* speaks to *Brady* violations as a result of delayed disclosures, rather than entirely undisclosed evidence. The *Hirsh* court summarized the importance of *Brady* in discouraging "mere carelessness" by government actors: "This is the reason that, under *Brady*, we impute the knowledge and possession of information by law enforcement to the prosecutor." *Hirsh*, 310 Kan. at 335. The *Hirsh* court then distinguished the case from other *Brady* violations because it involved a "belatedly disclosed report" that all parties learned about before the close of the defense case at trial, rather than a totally undisclosed report. 310 Kan. at 335. The *Hirsh* court refused to address whether "delayed rather than absent disclosure of exculpatory information may or may not qualify as a *Brady* violation." 310 Kan. at 336. But the court acknowledged other jurisdictions where a violation would not be found if the evidence was disclosed with enough time for the defendant to use the evidence. See 310 Kan. at 336. The *Hirsh* court summarized the relevant caselaw as follows:

> "*Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017) (*Brady* does not require pretrial disclosure; disclosure with enough time for defendant to use is sufficient); *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) (no prejudice if disclosure allows effective use at trial); *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) (due process satisfied, in part, because information known in time for use); *State v. Guilbert*, 306 Conn. 218, 272, 49 A.3d 705 (2012) (evidence disclosed during trial not suppressed within meaning of *Brady*, quoting *State v. Walker*, 214 Conn. 122, 126, 571 A.2d 686 [1990]); *State v. Clifton*, 296 Neb. 135, 163-64, 892 N.W.2d 112 (2017) (information known to State week before trial; no *Brady* violation, in part, because defense had opportunity to cross-examine using evidence); *State v. Pickens*, 141 Ohio St.

3d 462, 483, 25 N.E.3d 1023 (2014) (no *Brady* violation if disclosed with enough time to use information); *State v. Pinder*, 114 P.3d 551, 557-58 (Utah 2005) (no suppression where defendant had opportunity to use information, information known before trial, or defendant reasonably should have known of evidence); *Thomas v. State*, 131 P.3d 348, 353 (Wyo. 2006) (due process satisfied if evidence is disclosed with enough time for defendant to use evidence)." 310 Kan. at 336.

After careful consideration, we cannot find that a true *Brady* violation occurred in this case. We agree with the district court that the e-mails in question were impeaching. Certainly they had been suppressed by the State, although inadvertently. The district court was absolutely correct in reprimanding the State for the breakdown in transmitting evidence between law enforcement and the prosecutor. However, we also concur with the district court that there was insufficient prejudice by the delayed disclosures to compromise Henderson's ability to have a fair trial. And we find sufficient similarity between the facts of this case, where the delayed e-mails were ultimately available to the defense at trial, and the holdings in cases like *Quarterman*, *Almendares*, *Pickens*, and *Thomas*, to convince us that Henderson was not the victim of a *Brady* violation.

But even assuming, arguendo, that Henderson is correct and a *Brady* violation did occur, we cannot agree with his conclusion that a *Brady* violation is per se prosecutorial misconduct. The dicta in *Hirsh* suggests that the Kansas Supreme Court is, at a minimum, open to considering this interpretation. And the State's argument under this approach is persuasive to us: "Holding that situations where law enforcement fails to disclose exculpatory evidence through no fault of the prosecutor constitute misconduct, opens up countless cases to dismissal through K.S.A. 2019 Supp. 22-3402(g). Similarly, it likely opens that prosecutor up to disciplinary action even though they have not fit the description from *Sherman*."

Any possible *Brady* violation here would follow the rules outlined by the *Hirsh* court. The State disclosed the evidence before trial and Henderson was given ample time

15

to review and use the evidence for his trial. See *Gill*, 850 F.3d at 343 (*Brady* does not require pretrial disclosure; disclosure with enough time for defendant to use is sufficient); *Quarterman*, 536 F.3d at 335 (no prejudice if disclosure allows effective use at trial); *Almendares*, 397 F.3d at 664 (due process satisfied, in part, because information known in time for use).

In summary, we cannot find that the State's lapses in fully complying with discovery orders in this case, while totally blameworthy, created a violation of *Brady*. Thus, under Henderson's theory of the case, no *Brady* violation means no prosecutorial misconduct. But even if Henderson is correct, and a *Brady* violation did occur, under the specific facts of this case we agree with the district court that there was no prosecutorial misconduct. Since Henderson's contentions lack merit, we find that the 133 days charged by the district court to the defense should not be reallocated to the State, and Henderson's statutory speedy trial rights under K.S.A. 2019 Supp. 22-3402 have not been violated.

*Constitutional speedy trial*

Much like his first issue, Henderson next argues that the State's failure to provide timely discovery of exculpatory evidence violated his constitutional right to a speedy trial.

Whether a defendant's constitutional right to a speedy trial has been violated is a question of law over which this court has unlimited review. *State v. Weaver*, 276 Kan. 504, 505, 78 P.3d 397 (2003).

The United States Supreme Court has set forth a four-factor balancing test to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33

16

L. Ed. 2d 101 (1972); *Weaver*, 276 Kan. at 506 (applying *Barker* to Sixth Amendment speedy trial challenge). "None of these four factors, standing alone, is sufficient for finding a violation. Instead, the court must consider them together along with any other relevant circumstances." *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004).

1. *Length of delay*

Courts have consistently held that this factor, the length of delay, is "'to some extent a triggering mechanism.'" *Rivera*, 277 Kan. at 113. In *Barker*, the United States Supreme Court held that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. Whether the length is presumptively prejudicial depends on the "peculiar circumstances of the case." 407 U.S. at 530-31. Accordingly, the "tolerable delay for an ordinary crime is less than for a complex one." *Weaver*, 276 Kan. at 511. The constitutional speedy trial right attaches at the formal charging or arrest, whichever occurs first. *Rivera*, 277 Kan. at 112.

Henderson was arrested on October 26, 2016, and his trial began on April 9, 2018—resulting in a delay of just over 17 months. Henderson argues that this delay is presumptively prejudicial because "this was a relatively straightforward case for the State to try." Henderson argues that the State only called three law enforcement officers for its case-in-chief, the State offered no rebuttal to his case-in-chief, and any motions filed after the fall continuance are "directly attributable" to the State's discovery error. In opposition, the State argues that the case was not as simple as Henderson claims because of the large number of e-mails presented, the issues with electronic discovery, and because "Henderson litigated this case to the fullest" by filing multiple pretrial motions and presenting a "robust defense at trial."

17

Henderson relies solely on *Weaver* to support his position that this delay was presumptively prejudicial. In *Weaver*, the Kansas Supreme Court found that a 15-month delay in a "simple and straightforward" possession of cocaine with intent to sell case was presumptively prejudicial. 276 Kan. at 510-11. The *Weaver* court also recognized that the police found the cocaine and money on the defendant and "[t]he State's evidence against him was presented in 64 transcript pages of testimony." 276 Kan. at 510-11.

Recently, the Kansas Supreme Court found that a delay of about 19 months was presumptively prejudicial. See *State v. Owens*, 310 Kan. 865, 875, 451 P.3d 467, 474-75 (2019). The *Owens* court clarified that courts should not conflate the first *Barker* factor—length of delay—with the second *Barker* factor—reason for delay—when deciding whether the delay was presumptively prejudicial. 310 Kan. at 873-74, 451 P.3d at 474. For example, a court should not consider whether the defendant requested the continuances when making the presumptive determination: "*Barker*'s analysis conveys that even if a defendant pushes for delay in order to gain some advantage, the delay itself can be excessive and preemptively prejudicial." 310 Kan. at 874, 451 P.3d at 474 (citing *Barker*, 407 U.S. at 534-36). The court acknowledged that Owens' counsel requested 10 continuances and that the delay may have been partially used to gain an advantage by Owens. But the court ultimately found:

> "So was the 19-month delay presumptively prejudicial? Again, under *Barker*, the overarching consideration in determining whether the delay is presumptively prejudicial is whether the delay is reasonable given the complexity of the case. Here, Owens was charged with 'ordinary street crime[s].' Thus, referring to *Barker*'s example, 'the delay that can be tolerated . . . is considerably less than for a serious, complex conspiracy charge.' The State's case largely hinged on [witness and officer] identification of Owens and the physical evidence recovered—Owens' hat and phone and the gun. This was a simple and straightforward case, and the nature of the evidence involved does not justify a 19-month delay between Owens' arrest and trial. [Citations omitted.]" 310 Kan. at 875, 451 P.3d at 474-75.

18

The State's argument here conflates the first and second *Barker* factors in exactly the way that *Owens* warned against. The State only relies on *reasons* for the delay to make its argument, rather than arguing why the case was complex. Like *Owens* and *Weaver*, the State's case largely hinged on the testimony of two law enforcement officers and the evidence in the form of e-mails exchanged between Henderson and Evans. Neither the issues encountered with electronic discovery, nor the "robust defense" put on by Henderson, affect the complexity of the single count for which Henderson was charged. The 17-month delay was presumptively prejudicial.

## 2. *Reasons for delay*

Having found that the delay in this case was presumptively prejudicial, we must proceed to consideration of the remaining three factors under *Barker*. *Barker* explained the relevant considerations for the second factor—reasons for delay:

> "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." 407 U.S. at 531.

Henderson appears to imply that any discovery delay or *Brady* violation needs to be weighted heavily against the State. Henderson cites no authority for this position but cites the State's duty to disclose exculpatory evidence under *Brady*. According to Henderson, "[t]he two last-minute *Brady* disclosures that followed were entirely avoidable, and should weigh heavily against the State."

As stated by *Barker*, considerations that should be weighted heavily against the State are such delays that are deliberate attempts in order to hamper the defense. Here,

19

the discovery violations did not seek to hamper the defense, nor were they deliberate in any way. The district court found the violations were inadvertent, even if the State should have known the evidence was missing. The discovery violations would more likely fall as a neutral reason, due to the negligence by the State when violating the discovery statute.

While *Barker* found that a neutral reason should still be considered when weighing the reasons for the delay, the discovery issues were not the only reasons Henderson's case took 17 months to get to trial. The *Owens* court relied on *United States. v. Larson*, 627 F.3d 1198, 1208 (10th Cir. 2010), to support the finding that delays attributable to a defendant do not weigh against the government. In *Owens*, the defendant argued that he had not agreed to continuances requested by his trial counsel, nor was he present at any continuance hearings, and therefore those continuances could not be attributed to him. Our court found, and the Kansas Supreme Court agreed, that the defendant acquiesced to the continuances because they were requested to pursue a plea agreement that the defendant asked for and he understood that pursuing a plea would require continuances. *Owens*, 310 Kan. at 878-79, 451 P.3d at 476-77. Because he acquiesced, the "counsel's requests for continuances should be weighed against him in considering the reasons for the delay." 310 Kan. at 879, 451 P.3d at 477.

In his brief, Henderson acknowledged that "several" motions were filed before the first discovery violation in September 2017, which was 11 months after Henderson's arrest. Of the remaining six months, Henderson waived his speedy trial right to approximately four of the six. The district court had availability to reschedule the original trial date of September 18, 2017, to October 16, 2017, but Henderson chose not to do this. Instead, Henderson agreed to waive his speedy trial right for approximately four months—from October 16, 2017, to February 26, 2018—to pursue more motions to suppress and dismiss. Although these motions related to the discovery violations, Henderson nevertheless acquiesced to the delays by waiving his speedy trial rights for those four months.

20

Based on *Owens*, a delay caused by the defendant cannot be weighed against the State. Henderson filed multiple motions that required hearings for the first 11 months and went on to waive his right for much of the remaining months following the discovery violations. Because the violation was inadvertent, we consider it to be neutral for the State and therefore the remaining delays are mainly attributable to Henderson. Although this factor could arguably be weighed against Henderson, we will treat it as neutral.

3. *Defendant's assertion of his or her right*

Before the final trial setting, Henderson moved the district court to find that both his constitutional and statutory speedy trial rights had been violated by the delays. Our court has previously found that asserting this right in a motion to dismiss, as Henderson did, is sufficient to satisfy this factor. See *State v. Gill*, 48 Kan. App. 2d 102, 115, 283 P.3d 236 (2012).

The Kansas Supreme Court has found that appellate courts "can weigh [a defendant's] efforts to assert his [or her] right to a speedy trial." *Rivera*, 277 Kan. at 117. And "'failure to assert the right will make it difficult for the defendant to prove that he [or she] was denied a speedy trial.'" *State v. Fitch*, 249 Kan. 562, 565, 819 P.2d 1225 (1991) (quoting *Barker*, 407 U.S. at 532). The *Rivera* court found that this factor did not weigh in favor of the defendant because his "minimal attempts to assert his rights [were] counterbalanced" by his two escapes from custody, the late timing of filing motions, and his untimely failure to set his motion with the court. 277 Kan. at 118.

Along with *Rivera*, the State relies on federal law to support its argument that Henderson did not "faithfully, frequently, and vocally declare[] his right from the start of the case." See *United States v. Black*, 830 F.3d 1099, 1120 (10th Cir. 2016) (finding that this factor "weighs against a defendant who weakly asserts his speedy-trial right long after he could have, but the factor weighs in favor of a defendant who early, frequently,

21

and forcefully asserts his right"); see also *United States v. Margheim*, 770 F.3d 1312, 1328-29 (10th Cir. 2014) (finding that third factor weighed against defendant when defendant moved to dismiss 19 months after indictment, noting that "it is difficult to overlook how late [the defendant's] motions to dismiss the indictment appear on the pretrial timeline").

Here, the only time Henderson asserted his rights was when he moved to dismiss the case based on speedy trial grounds on March 12, 2018—over 16 months after he was arrested and a few weeks before the start of his trial. Before that, on February 26, 2018, the day the trial was set to begin when the second set of missing evidence was discovered, Henderson's counsel only said, "I may be inclined to file a motion for constitutional speedy trial violation." This was the second discovery violation by the State that caused Henderson's counsel to ask for another continuance but even then Henderson did not assert his speedy trial right—he merely felt "inclined to file a motion."

Although in *Gill* a panel of our court found a motion to dismiss to be enough to satisfy this factor, the remaining caselaw suggests that Henderson did not sufficiently assert his constitutional speedy trial right under *Barker*. Following federal law, we find the State's position to be persuasive:  Henderson did not assert his right "early, frequently, and forcefully." *Black*, 830 F.3d at 1120. The State's argument is also persuasive under *Rivera* because Henderson's single attempt to assert his rights was counterbalanced by his motion filed less than a month before his trial started and 16 months after he was charged. See *Rivera*, 277 Kan. at 117-18. He did not assert his rights after the first discovery violation, nor did he assert it after the second discovery violation. By applying *Rivera*, we find this factor to weigh in favor of the State.

4. *Prejudice to the defendant*

In *Barker*, the United States Supreme Court summarized how courts should assess prejudice under a constitutional speedy trial analysis:

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." 407 U.S. at 532.

Henderson argues that the second and third interests are the "most relevant" to his case and but makes no argument for the first interest. An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). As to the second interest, anxiety and concern of the accused, Henderson briefly argues that the media coverage of his case increased his stress during the delay and "also may have tainted jurors and potential jurors regarding news coverage." Multiple news articles were in the record but no evidence supports his contention that he had increased stress or anxiety because of the delays, nor is there any support for his contention that the media coverage may have tainted the jury.

As for the third consideration, impairment of defense, Henderson appears to argue that delays cause prejudice because events and memories fade with such delays. See *Barker*, 407 U.S. at 532 ("There is also prejudice if defense witnesses are unable to recall accurately events of the distant past."). Henderson does not explain how the delays in this case impaired his defense other than citing *Barker* to say that something may have been forgotten during the delay. Beside this very general allegation, Henderson does not point to any specific instances where memories had lapsed or how the delay thwarted his

23

ability to defend himself. Because of this lack of specificity, we do not find his argument persuasive.

As argued by the State, the e-mails that made up most of the State's case were electronic and accessible at any time. Henderson's defense was not impaired due to the delays because he was given all of the e-mails after they were discovered. Although the discovery of the e-mails caused obvious violations by the State, these violations did not impair Henderson's defense either. After discovering the missing e-mails, Henderson was granted months to review the e-mails, hire an expert, and use the e-mails in his defense at trial. Henderson called multiple witnesses as part of his defense, but he made no argument for how his witnesses were unable to recall accurately events of the past, nor is it evident from the record.

Henderson also appears to argue that the news articles about the delays may have tainted the jury and therefore impaired his defense. This contention has no basis in the record because the articles were factual, and there is no support to suggest that the jury was biased because of them.

The delays did not impair Henderson's defense, and no evidence supports Henderson's contention that the delay caused more anxiety and concern for himself. Henderson did not suffer prejudice under the fourth factor of *Barker*, and this factor will be weighed against Henderson.

Based on our analysis of the four factors outlined in *Barker*, Henderson's constitutional speedy trial rights were not violated. Although the 17-month delay was presumptively prejudicial, and we consider the reasons for the delay as a net neutral factor, the minimal assertion of his speedy trial rights and the lack of prejudice from the delay both weigh in favor of the State. The district court did not err in denying Henderson's motion to dismiss based on his constitutional speedy trial rights.

24

*The law of venue*

For his third issue, Henderson argues the State misstated the law during closing argument "when it told the jury that proving receipt of e-mail #540 in Douglas County proved venue in Douglas County." Henderson contends that if not for this misstatement, the jury would have returned a different verdict.

During closing arguments, Henderson's counsel objected to the State's argument regarding venue. The State said: "The evidence tells you that the email was received by [Sergeant] Evans while he was present in Douglas County, Kansas. Legally that is sufficient to establish that the crime occurred in Douglas County."

We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *Sherman*, 305 Kan. at 109. To evaluate error, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors." 305 Kan. at 109. If error is found, then the "court must next determine whether the error prejudiced the defendant's due process rights to a fair trial" by employing "the traditional constitutional harmlessness inquiry." 305 Kan. at 109.

A misstatement of law must be reviewed on appeal to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it falls outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006). A prosecutor's misstatement of the law has been found to constitute prosecutorial error. See *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015); *State v. Akins*, 298 Kan. 592, 606, 315 P.3d 868 (2014).

The general rule for venue is articulated in K.S.A. 22-2602: "Except as otherwise provided by law, the prosecution shall be in the county where the crime was committed." The following statute, K.S.A. 22-2603, provides: "Where two or more acts are requisite

25

to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any such acts occur."

Henderson was charged with a violation of K.S.A. 2019 Supp. 21-5509(a), which defines electronic solicitation as: "Electronic solicitation is, by means of communication conducted through the telephone, internet or by other electronic means, enticing or soliciting a person, whom the offender believes to be a child, to commit or submit to an unlawful sex act."

Henderson argues that the plain language of K.S.A. 2019 Supp. 21-5509(a) "does not expressly include or exclude *receipt* of a solicitation as an element of the offense of electronic solicitation." Henderson relies on the language of the general criminal solicitation statute to support his argument. This statute, K.S.A. 2019 Supp. 21-5303(b), provides: "It is immaterial . . . that the actor fails to communicate with the person solicited to commit a felony if the person's conduct was designed to effect a communication." As such, Henderson argues that receipt of the soliciting message is not required for the crime of electronic solicitation and the prosecutor's comment that the State proved venue by demonstrating Evan's presence in Douglas County when he received the soliciting e-mail was a misstatement of law.

A panel of this court has addressed this exact issue and held that the statute requires the soliciting message to be both made and received. *State v. Drach*, No. 105,837, at *2, 2012 WL 2785911 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1250 (2013). The *Drach* panel held that the statute for electronic solicitation "requires a communication of an electronic solicitation to one perceived by the offender to be under a specified age to commit or submit to an unlawful sexual act, which involves *both* the communication of such a solicitation and the comprehension of that solicitation by another perceived by the offender to be a child." 2012 WL 2785911, at *2. The panel added: "The elements are twofold: the invitation for an unlawful sex act must be both

26

made and received." 2012 WL 2785911, at *2. The *Drach* panel relied on *State v. Woolverton*, 284 Kan. 59, 68-70, 159 P.3d 985 (2007), to support its conclusion. In *Woolverton*, the Kansas Supreme Court addressed a similar issue as to the statute for criminal threat and concluded that a "'threat to . . . [c]ommit violence communicated with [specific] intent" required both a "declarant and a receiver." 284 Kan. at 69.

Henderson acknowledges the *Drach* decision in his brief but argues that the panel in *Drach* relied largely on cases "defining 'communication'" and did not consider the argument he presents that the criminal solicitation statute "expressly *excludes* receipt of a solicitation as an element of a solicitation offense." Henderson's attempt to distinguish *Drach* is not persuasive, however, because it ignores the general rules for conflicting statutes and the plain language of the statute.

Henderson correctly asserts that the criminal solicitation statute, K.S.A. 2019 Supp. 21-5303(b), clarifies that the crime is completed even if the message was never received by its intended recipient. He also correctly asserts that the electronic solicitation statute is silent as to receipt. K.S.A. 2019 Supp. 21-5509(a). Yet, Henderson makes no argument concerning the interpretation of conflicting statutes.

When the provisions of two statutes conflict, the more specific statute governs. *State v. Chavez*, 292 Kan. 464, 466, 254 P.3d 539 (2011); *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 282, 241 P.3d 15 (2010). Here, the State persuasively argues that the electronic solicitation statute is more specific than the criminal solicitation statute. K.S.A. 2019 Supp. 21-5303(a) defines criminal solicitation as "commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony." This language is much more general than the narrow language of the electronic solicitation statute that requires three things: (1) communication of an enticement or solicitation through electronic

27

means; (2) belief that the other individual is a child; and (3) the criminal act enticed or solicited was an unlawful sex act. See K.S.A. 2019 Supp. 21-5509(a). These requirements are far more specific than what is required under the general criminal solicitation statute. As such, the electronic solicitation statute controls and the plain language of the statute follows the reasoning in *Drach*: "the invitation for an unlawful sex act must be both made and received." 2012 WL 2785911, at *2.

But even if electronic solicitation was limited to only transmission of the communication, venue would still be proper under K.S.A. 2019 Supp. 22-2619. The State correctly argues that this statute provides special venue rules for crimes committed with an electronic device. See K.S.A. 2019 Supp. 22-2619(a). Subsection (b) provides that "[i]n addition to the venue provided for under any other provision of law, a prosecution for any crime committed with an electronic device may be brought in the county in which . . . the victim was present at the time of the crime." K.S.A. 2019 Supp. 22-2619(b)(3). Although Heather was not a real teenager, the intended victim—Sergeant Evans as Heather—was still present in Douglas County at the time of the crime.

Under *Drach* and a plain reading of the statute, the prosecutor did not misstate the law during closing argument. In addition, the language of K.S.A. 2019 Supp. 22-2619 supports the prosecutor's argument that venue was established when Sergeant Evans received the soliciting message in Douglas County. Thus, the prosecutor did not commit error during closing argument.

*Proof of venue*

Next, Henderson argues that the State failed to prove that he committed the crime in Douglas County. The State argues that venue was proved because venue is proper both in any county where one of the acts required to commit the crime was accomplished and where the victim was located.

28

Appellate review of a sufficiency of the evidence claim is summarized as:

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Henderson relies on his argument on the previous issue to support his contention that the State had to prove he sent the e-mail from Douglas County in order to establish venue. Henderson maintains that "proving that the solicitation was *received* in Douglas County is legally insufficient to prove the venue element of the offense. Therefore, the State was required to prove that email #540 was sent from Douglas County. [Citation omitted.]"

Again, Henderson's argument ignores the statute that authorizes venue for crimes committed with an electronic device. See K.S.A. 2019 Supp. 22-2619. As the State argues, venue could be proved in two ways under this statute. Of relevance here, K.S.A. 2019 Supp. 22-2619(b) states:

> "(b) In addition to the venue provided for under any other provision of law, a prosecution for any crime committed with an electronic device may be brought in the county in which:
> (1) Any requisite act to the commission of the crime occurred;
> . . . .
> (3) the victim was present at the time of the crime; . . ."

The State argues that because the electronic solicitation statute requires both the commission and receipt of the soliciting message, venue was satisfied under K.S.A. 2019 Supp. 22-2619(b)(1). We find this argument persuasive. The State presented sufficient

evidence to prove the requisite act of receipt when they established Sergeant Evans received e-mail #540 while in Lawrence. See K.S.A. 2019 Supp. 21-5509(a); *Drach*, 2012 WL 2785911, at *2. Therefore, since receipt is a requirement under the statute, the State presented sufficient evidence to prove venue under K.S.A. 2019 Supp. 22-2619(b)(1).

The State also persuasively argues that venue was established under K.S.A. 2019 Supp. 22-2619(b)(3), which authorizes venue in the county where the victim was present at the time of the crime. Here, the intended victim of the soliciting message—e-mail #540—was Heather. Although Heather was not an actual teenage girl, the electronic solicitation statute requires the offender to entice or solicit a person "whom the offender believes to be a child." K.S.A. 2019 Supp. 21-5509(a). This language suggests that the statute does not require the victim to be an actual child. Rather, the statute requires the offender to believe the victim is a child. Based on this language, the victim was Heather for purposes of venue and although Heather was not who Henderson thought she was, he still believed her to be a person who was a child as K.S.A. 2019 Supp. 21-5509(a) requires. As a result, the victim, Sergeant Evans as Heather, was in Douglas County when the act occurred.

But even if we found that neither subsection (b)(1) nor (b)(3) applies here, the evidence was sufficient for a rational fact-finder to find that Henderson sent the soliciting message from Douglas County on October 25, 2016. At trial, the State admitted all 660 e-mails exchanged between Henderson and Heather into evidence. A review of the e-mails found circumstantial evidence placing Henderson in Lawrence on October 25, 2016, around the time the soliciting message was sent. Around 3:30-3:45 p.m. on October 25, 2016, Henderson sent Heather multiple e-mails saying he was "getting to work 40 minutes early" and had to "wait till 4 to clock in" but was "getting off [work] around eight or nine [p.m.]." At 3:47 p.m., Henderson and Heather exchanged these e-mails:

"[Henderson]:  Yes. What part of town do you live in? Why do you do online school? Just curious[.]

"[Heather]:  I[']m in [L]awrence. Do u kno were snap fitness is n subway?

"[Henderson]:  Yes really close to where I work[.]"

A few minutes later, at 4:05 p.m., Henderson sent the soliciting message in e-mail #540. From these e-mails, it would follow that Henderson was at work when he sent the soliciting e-mail:  Henderson told Heather that he started work at 4 p.m. and would get off around "eight or nine." Henderson also told Heather that he worked "really close" to where she lived in Lawrence. As such, the e-mails provide evidence that Henderson was at work, presumably in Lawrence, when he sent the soliciting message.

Although this evidence is circumstantial and does not prove Henderson actually was in Douglas County at the time of the crime, a verdict may be supported by circumstantial evidence, if the evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). These e-mails were admitted into evidence and thus the jury was able to consider them when deciding whether the State proved that the alleged offense occurred in Douglas County.

With this evidence in mind, we find that there was sufficient evidence to allow a rational fact-finder to find that Henderson was in Douglas County when he sent the soliciting message. This would satisfy Henderson's argument that the e-mail must have been sent in Douglas County, and it would satisfy K.S.A. 2019 Supp. 22-2619(b)(1) by showing a requisite act of the crime was satisfied even if Henderson is correct that receipt is unnecessary in the statute. See K.S.A. 2019 Supp. 21-5509(a). In summary, we find the State presented sufficient evidence to support venue in Douglas County.

31

*Placement of "guilty" before "not guilty" on the verdict form*

Henderson argues that the district court committed reversible instructional error when it infringed on his presumption of innocence and placed "guilty" before "not guilty" on the verdict form. Henderson's trial counsel objected to the jury instruction regarding this issue, and the district court denied the request.

"While a verdict form is not technically a jury instruction, it is part of the packet sent with the jury which includes the instructions and assists the jury in reaching its verdict. It is appropriate to apply the same standard of review applicable to the review of instructions." *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009). As a result, we apply a three-step analysis when analyzing a challenge to a verdict form by "'(1) [d]etermining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred; and (3) assessing whether the error requires reversal.' [Citation omitted.]" *State v. McDaniel*, 306 Kan. 595, 614, 395 P.3d 429 (2017) (quoting *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 [2015]).

Two cases decided by the Kansas Supreme Court have addressed the specific issue raised by Henderson. In *State v. Wesson*, 247 Kan. 639, 652, 802 P.2d 574 (1990), the court denied the defendant's contention that the verdict form violated his presumption of innocence because "the 'guilty' blank preceded the 'not guilty' blank." The *Wesson* court reasoned: "A defendant is presumed innocent and the jury is so instructed. The purpose of a trial is to determine if the accused is guilty. We see no prejudice to the accused and, in any event, [the presumption of innocence instruction] would cure any possibility of error." 247 Kan. at 652. The Kansas Supreme Court briefly reaffirmed this finding in *State v. Wilkerson*, 278 Kan. 147, 159, 91 P.3d 1181 (2004).

In his brief, Henderson acknowledges the precedent of *Wesson* and *Wilkerson* but argues that "[t]he basis of the [Kansas Supreme Court's] decision in *Wesson* and, therefore, in *Wilkerson*, is a misstatement of law. The determination of guilt is not the sole purpose of a jury trial." Henderson maintains that "*Wesson*'s statement that the 'purpose of a trial is to determine if the accused is guilty' highlights the very issue Mr. Henderson objected to here: the verdict form shifts the jury's focus to ***guilt***. Instead, the jury must be focused on ***innocence***."

To state the obvious, this court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Henderson provides no authority that suggests the Kansas Supreme Court is departing from this position, and other panels of our court have consistently declined to reevaluate *Wesson*. See *State v. Hayes*, 57 Kan. App. 2d ___, ___ P.3d ___ (No. 120,417, filed March 6, 2020), slip op. at 18-19; *State v. Huffman*, No. 117,814, 2018 WL 6580110, at *7 (Kan. App. 2018) (unpublished opinion), *rev. denied* 310 Kan. __ (September 9, 2019); *State v. Salas-Torres*, No. 116,581, 2017 WL 5180763, at *4-5 (Kan. App. 2017) (unpublished opinion), *petition for rev. pending*; *State v. Pack*, No. 110,467, 2015 WL 1513974, at *5 (Kan. App.) (unpublished opinion), *rev. denied* 302 Kan. 1018 (2015).

Henderson's jury also received an instruction much like the instruction in *Wesson.* The instruction stated: "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty." Jurors are presumed to follow their instructions, and there is no evidence in the record to suggest that the jury did not follow this instruction. See *State v. Rogers*, 276 Kan. 497, Syl. ¶ 1, 78 P.3d 793 (2003).

We are duty bound to follow the precedent of the Kansas Supreme Court and, as such, we find that the district court did not commit reversible error when it refused Henderson's request to place "not guilty" before "guilty" on the verdict form.

*Cumulative error*

As his final argument, Henderson maintains that "[t]he errors described above did not exist in a vacuum" and when considered together, they required his conviction to be reversed.

The test for cumulative error is whether the totality of the circumstances established that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016); *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Santos-Vega*, 299 Kan. 11, 27-28, 321 P.3d 1 (2014).

The court will find no cumulative error when the record fails to support the errors defendant raises on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). A single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018).

But since we have found no errors as alleged by Henderson, the cumulative error doctrine does not apply to this case.

Affirmed.

* * *

ATCHESON, J., concurring:  I concur in the result the majority reaches and, thus, would affirm Defendant Michael L. Henderson's conviction for electronic solicitation of a child. Henderson has not shown his statutory or constitutional rights to a speedy trial were impermissibly compromised, and he received a fair trial, if not a perfect one. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013).